# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| N.S., by his parents, BRUCE and SUSAN STEIN, *et al.*, <br><br>     Plaintiffs, <br><br>      v. <br><br> DISTRICT OF COLUMBIA, *et al.*, <br><br>     Defendants. | Civil Action No. 09–621 (CKK) |

## MEMORANDUM OPINION
### (May 4, 2010)

Plaintiffs Bruce and Susan Stein, on behalf of their minor son N.S., bring this action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* Plaintiffs claim that N.S. was denied a free appropriate public education ("FAPE") as required by the Act by Defendants District of Columbia, Adrian M. Fenty, the Mayor of the District of Columbia, and Michelle A. Rhee, Chancellor of District of Columbia Public Schools ("DCPS") (collectively, "Defendants"). Plaintiffs seek to reverse the decision of an impartial hearing officer, who rejected Plaintiffs' claims that the individualized education program ("IEP") created for N.S. was inadequate and that N.S. should have been placed in a private school that could address his educational needs for the 2008-09 school year. The Steins subsequently placed N.S. in a private school and now seek reimbursement from Defendants for his education expenses as well as attorneys' fees and costs. Presently pending before the Court are Plaintiffs' [13] Motion for Summary Judgment and Defendants' [14] Motion for Summary Judgment, both of which have been fully briefed and are now ripe for decision. Also pending before the Court is

Plaintiffs' [25] Motion for Leave to Supplement the Record. Having considered the parties'

filings, the applicable authorities, and the record as a whole, the Court shall DENY Plaintiffs'

Motion for Leave to Supplement the Record, GRANT Plaintiffs' Motion for Summary Judgment,

and DENY Defendants' Motion for Summary Judgment.

## I. BACKGROUND

### A. The IDEA Statutory Framework

The purpose of the IDEA is "to ensure that all children with disabilities have available to

them a free appropriate public education that emphasizes special education and related services

designed to meet their unique needs . . . ." 20 U.S.C. § 1400(d)(1)(A). "Implicit" in the IDEA's

guarantee "is the requirement that the education to which access is provided be sufficient to

confer some educational benefit upon the handicapped child." *Bd. of Educ. of Hendrick Hudson*

*Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 200 (1982). As a condition of receiving funding under

the IDEA, school districts are required to adopt procedures to ensure appropriate educational

placement of disabled students. *See* 20 U.S.C. § 1413. A student's eligibility for a FAPE under

the IDEA is determined by the results of testing and evaluating the student, and the findings of a

"multidisciplinary team" or "individualized education program team" ("MDT/IEP team"). *Id.*

§ 1414. Such a team consists of the parents and teachers of the disabled student, as well as other

educational specialists, who meet and confer in a collaborative process to determine how best to

accommodate the needs of the student and provide a FAPE. *See id.* § 1414(d)(1)(B).

School districts must also develop a comprehensive plan, known as an individualized

education program ("IEP"), for meeting the special educational needs of each disabled student.

*See* 20 U.S.C. § 1414(d)(2)(A). The IEP must be formulated in accordance with the terms of the

IDEA and "should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Rowley*, 458 U.S. at 204. "If no suitable public school is available, the school system must pay the costs of sending the child to an appropriate private school." *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 519 (D.C. Cir. 2005) (citation and alterations omitted). The IDEA requires IEPs to include, among other things: (1) "a statement of the child's present levels of academic achievement and functional performance, including . . . how the child's disability affects the child's involvement and progress in the general education curriculum"; (2) "a statement of measurable annual goals, including academic and functional goals, designed to . . . meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum . . . [and] meet each of the child's other education needs that result from the child's disability"; (3) "a description of how the child's progress toward meeting the[se] annual goals . . . will be measured"; and (4) "a statement of the special education and related services and supplementary aids and services . . . to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child." *Id.* § 1414(d)(1)(A)(i).

The IDEA requires that children with disabilities be placed in the "least restrictive environment" so that they can be educated in an integrated setting with children who are not disabled to the maximum extent appropriate. *See* 20 U.S.C. § 1412(a)(5)(A). The IDEA also guarantees parents of disabled children the opportunity to participate in the evaluation and placement process. *See* 20 U.S.C. §§ 1414(f), 1415(b)(1). Parents who object to their child's "identification, evaluation, or educational placement" are entitled to an impartial due process

hearing, *see* 20 U.S.C. §§ 1415(b)(6), (f)(1), at which they have a "right to be accompanied and advised by counsel" and a "right to present evidence and confront, cross-examine, and compel the attendance of witnesses."  20 U.S.C. § 1415(h).  A qualified impartial hearing officer conducts the due process hearing in accordance with the Act.  5 D.C. Mun. Regs. § 3030.1.  Under the IDEA, a party is entitled to attorney's fees and costs if he or she is a "prevailing party."  20 U.S.C. § 1415(i)(3)(B).  To be a prevailing party, one must gain a "material alteration of the legal relationship of the parties" and gain a judgment on the merits.  *Bridgeforth v. Dist. of Columbia*, 933 F. Supp. 7, 10 (D.D.C. 1996).

Parents "aggrieved by" a hearing officer's findings and decision may bring a civil action in either state or federal court.  20 U.S.C. § 1415(i)(2); 5 D.C. Mun. Regs. § 3031.5.  The district court has remedial authority under the Act, and broad discretion to grant "such relief as the court determines is appropriate" under the IDEA as guided by the goals of the Act.  20 U.S.C. § 1415(i)(2)(C)(iii).

    B.    *Facts Relating to the Education of N.S.*

N.S. is an eight-year-old child living in the District of Columbia who has been determined to be eligible for special education and related services.  Defs.' Stmt.[1] ¶ 1.  N.S. has a

---

[1] As a preliminary matter, the Court notes that it strictly adheres to the text of Local Civil Rule 7(h) (formerly Rule 56.1 when resolving motions for summary judgment).  *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (finding district courts must invoke the local rule before applying it to the case).  The Court has advised the parties that it strictly adheres to Rule 7(h) and has stated that it "assumes facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." [9] Order at 1-2 (June 8, 2009).  Thus, in most instances the Court shall cite only to one party's Statement of Material Facts ("Stmt.") unless a statement is contradicted by the opposing party.  The Court shall also cite directly to evidence in the record, where appropriate.

range of educational disabilities, including significant speech/language, executive functioning, dyslexia, dysgraphia, and social/emotional difficulties, including a general dysregulation disorder. Pls.' Stmt. ¶ 2. From 2006 to 2008, N.S. attended kindergarten and first grade at Murch Elementary School, his neighborhood school. Defs.' Stmt. ¶ 2. N.S. was initially placed into special education services at Murch on March 8, 2007. *Id.*; *see* Admin. Record ("AR") 74-75 (Initial Placement and Prior to Action Notice).

During his time at Murch, N.S. received special education services using a "pullout" model in which specialized instruction was delivered outside the general education classroom setting with a special educator and fewer students. Pls.' Stmt. ¶ 7.[2] The IEP prepared for N.S. in September 2007 called for N.S. to receive 7.5 hours per week of specialized instruction from the special education teacher and half an hour per week of counseling from a school social worker. *See* AR 47 (9/21/07 IEP). All of these hours were provided as pullout instruction away from the general education classroom, and the September 2007 IEP called for N.S. to spend 25% of his overall time outside the general education setting. *See id.*; 2/24/09 Tr. at 148-49. This IEP also stated annual goals for N.S. such as "master first grade reading standards with 80% accuracy" and "master first grade math standards with 80% accuracy." *See* AR at 49-50. The September 2007 IEP indicated that supplemental aids and services could not be provided to N.S. in the general education setting because "[s]tudent requires small structured environment to accommodate disabilities." *See* AR at 53. Accordingly, the September 2007 IEP called for N.S.

---

[2] Defendants contend that "much of the pullout services for N.S. took place in the general education classroom setting." *See* Defs.' Resp. Stmt. ¶ 7. However, the record evidence cited for this proposition is testimony about what would have occurred in the 2008-09 school year, not what services were provided while N.S. was at Murch in 2006-08. *See* 2/24/09 Admin. Hr'g Tr. (hereinafter, "2/24/09 Tr.") at 38-39.

to be placed in a combination of general education and resource classroom (i.e., pullout) settings. *Id.*

N.S. experienced significant academic and behavioral difficulties while at Murch. Pls.' Stmt. ¶ 8. N.S.'s parents provided him with private outside educational services during this time, but he failed to make adequate progress. *Id.* ¶ 9. In January 2008, N.S.' parents arranged for him to be evaluated by Dr. Kimberly Glass. *Id.* ¶ 10. Dr. Glass found that N.S. had several educational disabilities and recommended the maximum amount of special education services to be implemented for the coming year in order to close the gap between N.S.'s academic skills and those of his peers. *Id.* Dr. Glass's report also indicated that N.S. had weak motor control, with very weak handwriting skills. *See* AR at 129-30.

On February 28, 2008, an MDT/IEP team meeting took place at Murch to review N.S.'s progress. Defs.' Stmt. ¶ 3. At the meeting, the parents asked if they could pay for a private tutor to come into the school and assist N.S. during school hours. Pls.' Stmt. ¶ 13. The MDT/IEP team told the parents that such an action would act as a rejection of the proposed IEP, meaning that N.S. would not receive any special education services from the District of Columbia. *Id.* On May 29, 2008, another MDT/IEP team meeting was convened, and after reviewing N.S.'s records, the team requested that new evaluations be conducted. Defs.' Stmt. ¶ 6.

On June 12, 2008, the MDT/IEP team met again to discuss N.S.'s IEP and placement for the upcoming 2008-09 school year. Pls.' Stmt. ¶ 16. This meeting was attended by N.S.'s parents, their counsel, their law clerk, a social worker, a speech and language pathologist, the special education coordinator for Murch, and other participants. Defs.' Stmt. ¶ 7. The record contains detailed notes from the meeting that describe the discussion that took place. *See* AR at

212-14 (Meeting Notes). The notes indicate that the MDT/IEP team would request an occupational therapy ("OT") evaluation of N.S. *See* AR 212. N.S.'s general education teacher indicated that N.S. "requires a good deal of one-to-one instruction." *Id.* at 213. The MDT/IEP team decided to increase N.S.'s special education services from 8 hours to 15.5 hours per week. Defs.' Stmt. ¶ 8. The team also proposed that N.S. receive all of his special education services in the general education setting using a less intensive "inclusion" model. Pls.' Stmt. ¶ 18. The meeting notes indicate that "[g]oals [were] shared in the context of the inclusion classroom" but also that the "[t]eam discusse[d] the need for more time in specialized instruction." *See* AR 213. The team decided that they "should revisit/review the inclusion model of [N.S.'s] instruction after the first advisory." *Id.* at 214.

N.S.'s parents expressed concerns that an inclusion program would be inappropriate and overwhelming to N.S., preventing him from making progress. Pls.' Stmt. ¶ 21. The parents then notified the team of their intent to place N.S. at the Lab School, a private special education school, and seek public funding for that placement. *Id.* ¶¶ 23, 32. In addition to their disagreement with the ultimate proposal, N.S.'s parents identified other problems with the IEP that they believed rendered it incomplete and inadequate. *Id.* ¶ 24. The June 2008 IEP failed to include N.S.'s present levels of academic achievement and functional performance. Pls.' Stmt. ¶ 25. The IEP failed to identify any supplementary aids and services that N.S. would receive in the classroom. *Id.* ¶ 30. The IEP also failed to include specific goals and objectives to address N.S.'s significant deficits in written language skills. *Id.* ¶ 27. The IEP indicated that N.S. "requires small structured environment to accommodate disabilities" and cites this as a reason why "curricular modification, accommodation and/or supplementary aids and services [cannot]

be used for a [least restrictive environment] setting in general education." *See* AR at 339. The IEP also repeated annual goals from the previous year's IEP, calling for N.S. in the second grade to "master first grade reading standards with 80% accuracy" and "master first grade math standards with 80% accuracy." AR at 336-37.

N.S. began the 2008-09 school year at the Lab School, where he is receiving an appropriate education. Pls.' Stmt. ¶¶ 32-34. N.S. did not attend Murch after the June 2008 IEP was developed. Defs.' Stmt. ¶ 14. On October 31, 2008, N.S.'s parents filed a request for a due process hearing to appeal the decision of the IEP team. Pls.' Stmt. ¶ 35. A due process hearing was convened over two days, December 12, 2008, and February 24, 2009, before Hearing Officer Latif Doman. Pls.' Stmt. ¶ 36.

### C.    *Testimony at the Due Process Hearing*

N.S.'s parents presented testimony at the due process hearing from three outside witnesses: Michelle Davis, a special education expert, Donna Pavluk, a speech and language therapy expert, and Christine Chang, an occupational therapy expert. Pls.' Stmt. ¶ 37. N.S.'s mother, Susan Stein, also testified. *Id.* DCPS presented testimony from Brenda Lewis, the principal at Murch, Andrea Chuahy, a special educator at Murch, and Jeanette Perry Mitchell, special education supervisor at Murch. *Id.* ¶ 38. Ms. Davis testified that N.S. had failed to make progress at Murch and that N.S. was making progress at the Lab School. *Id.* ¶ 40. Mses. Chang and Pavluk also noted N.S.'s progress at the Lab School and his need for extensive support even in that setting. *Id.* ¶ 42. DCPS's witnesses testified that the proposal at Murch was appropriate for N.S. *Id.* ¶ 44.

Principal Lewis explained in her testimony that for the 2008-09 school year, Murch

adopted a new inclusion model for special education known as the "schoolwide application model." *See* 2/24/09 Tr. at 54.  Ms. Lewis testified that she explained to N.S.'s parents how the inclusion setting works and what it would look like.  *See* 2/24/09 Tr. at 37-39.  She testified that she had explained that N.S. would receive a combination of instruction in the general education setting and pullout specialized instruction.  *See id.* at 37-38 ("[I]t was specifically stated by me that [N.S.] will not get strictly inclusion settings that he would also be able to have the pullout setting as well."); *id.* at 39 ("He would also be having the pullout specialized instruction so that he is meeting his benchmarks.")  Ms. Stein testified that it was her understanding that for the 2008-09 school year, Murch was not going to do pullout sessions anymore and that the June 2008 IEP called for N.S. to receive all of his instruction in the general education setting.  *See* 12/5/08 Admin. Hr'g Tr. (hereinafter, "12/5/08 Tr.") at 92-93.  Ms. Stein also testified that Murch officials did not explain to her precisely in what setting N.S. would receive his instruction and that "they'd just figure it out." *Id.* at 93.  Ms. Mitchell testified that the possibility of adding pullout sessions for N.S. was discussed at the June 2008 IEP meeting but that she did not know how clearly that message was received.  *See* 2/24/09 Tr. at 143.

Ms. Chuahy testified that at the meeting on June 12, 2008, the MDT/IEP team agreed that the 15 hours of specialized instruction should all be in the general education setting.  *See* 2/24/09 Tr. at 123-24.  Ms. Chuahy testified that she did not recommend pullout services at that time because the IEP called for possible adjustments to be made and pullout services could be added later. *Id.*  Specifically, Ms. Chuahy testified that the team discussed at the June meeting the possibility of adding pullout services after the first advisory meeting.  *See id.* at 125-27.  Both Ms. Lewis and Ms. Mitchell testified that the June 2008 IEP did not call for N.S. to be provided

with any pullout services. 2/24/09 Tr. at 57, 156. Ms. Mitchell explained that the intent was to reassess how N.S. was doing after an initial period to see whether pullouts would be necessary. *See id.* at 157. Ms. Mitchell also explained that Murch's adoption of the "schoolwide application model" had some bearing on N.S.'s placement. *Id.* at 149.

When asked how the June 2008 IEP would have been implemented at Murch, Ms. Chuahy testified that N.S. would have been provided two hours of specialized instruction each morning in reading and math, with one hour of additional instruction each afternoon. *See* 2/24/09 Tr. at 77-82. The two hours of reading and math instruction each morning would be provided in the general education classroom setting with the special education teacher giving special instruction to a small group of students. *See id.* at 78-79. Ms. Chuahy testified that N.S. would be pulled out of the classroom for the additional hour of instruction in the afternoon, which would be provided by the special education teacher. *See id.* at 81-82. Ms. Chuahy testified that additional pullout time could be arranged if necessary and could be provided by other reading and math specialists. *Id.* at 82-84. Ms. Mitchell testified that the IEP is "always a working document" that could be modified if necessary based on the student's needs, and that if pullout services were needed for N.S., he would get them. *See id.* at 142-44. Ms. Mitchell further testified if the MDT/IEP team had determined that N.S. could not make it in an inclusion program, it would have considered placement at another school. *Id.* at 144. Ms. Lewis testified that based on her personal knowledge of N.S., she believed he could be successful "[w]ith the inclusion as well as the additional supports provided through the pullout." 2/24/09 Tr. at 39.

D.     *The Hearing Officer Decision*

The Hearing Officer issued a written decision and order ("Hearing Officer Decision" or

"HOD") on March 6, 2009. *See* AR 1-6 (HOD). The Hearing Officer rejected Plaintiffs' claims

that Defendants denied N.S. a FAPE by failing to include necessary sections in his IEP. *Id.* at 5.

The Hearing Officer also rejected Plaintiffs' claims that the IEP was inappropriate because it

failed to meet N.S.'s needs. *Id.* The Hearing Officer concluded that Plaintiffs had not met their

burden to show that Murch was an inappropriate placement and that N.S. should have been

placed instead at the Lab School. *Id.* at 5-6. The Hearing Officer noted that because N.S. had

not spent any time at Murch learning under the June 2008 IEP, Plaintiffs' concerns about its

inadequacy were speculative. *Id.* at 5. The Hearing Officer also credited the testimony of DCPS

witnesses who said that N.S.'s needs could be addressed at Murch and found their testimony

more persuasive than Plaintiffs' witnesses. *Id.* In particular, the Hearing Officer found

persuasive the testimony of the special education teacher at Murch, Ms. Andrea Chuahy, who had

previous experience teaching at the Lab School and testified that N.S.'s needs could be met with

the IEP at Murch. *Id.* at 5-6. The Hearing Officer concluded that Plaintiffs had failed to rebut

her testimony that placement at Murch provided N.S. with the basic floor of opportunity required

by the IDEA. *Id.* at 6.

## II.  LEGAL STANDARD

### A.  *Summary Judgment Under Federal Rule of Civil Procedure 56*

The parties have filed cross motions for summary judgment pursuant to Federal Rule of

Civil Procedure 56. Summary judgment is proper when "the pleadings, the discovery [if any]

and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c). Under the summary judgment standard, the moving party bears the "initial responsibility

of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). All underlying facts and inferences are analyzed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248. To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier of fact could find for the non-moving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251-52 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586 (1986). Conclusory assertions offered without any factual basis for support do not satisfy an opponent's burden to set forth "affirmative evidence" showing a genuine issue for trial. *Broaddrick v. Exec. Office of the President*, 139 F. Supp. 2d 55, 65 (D.D.C. 2001) (citing *Laningham*, 813 F.2d at 1241).

       B.       *Review of an Administrative Decision Under the IDEA*

The IDEA permits "any party aggrieved by the findings and decision" rendered during administrative proceedings to "bring a civil action" in state or federal court without regard to the amount in controversy. 20 U.S.C. § 1415(i)(2). The reviewing court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). In a review of a Hearing Officer Decision ("HOD"), the burden of proof is always on the party challenging the administrative determination, who must "at least take on the burden of persuading the court that the hearing officer was wrong, and that a court upsetting the officer's decision must at least explain its basis for doing so." *Reid*, 401 F.3d at 521 (quoting *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988)).

The Supreme Court has held that the IDEA's preponderance-of-the-evidence standard of review does not authorize unfettered *de novo* review. *See Rowley*, 458 U.S. at 206 ("Thus the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.") Courts must give administrative proceedings "due weight," *id.*, and "[f]actual findings from the administrative proceedings are to be

considered prima facie correct." *Roark ex rel. Roark v. District of Columbia*, 460 F. Supp. 2d 32, 38 (D.D.C. 2006) (quoting *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003)). However, the statute also suggests "less deference than is conventional in administrative proceedings," *Reid*, 401 F.3d at 521, since the district court is allowed to hear additional evidence at the request of the party. *See* 20 U.S.C. § 1415(i)(2)(C)(ii). When no additional evidence is introduced in a civil suit seeking review of a HOD, a motion for summary judgment operates as a motion for judgment based on the evidence comprising the record. 20 U.S.C. § 1415(i)(2)(B); *District of Columbia v. Ramirez*, 377 F. Supp. 2d 63, 67 (D.D.C. 2005).

Under the IDEA, parents who unilaterally decide to place their disabled child in a private school, without obtaining the consent of local school officials, "do so at their own financial risk." *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993) (quoting *Sch. Comm. v. Dep't of Educ.*, 471 U.S. 359, 374 (1985)). Parents may only receive tuition reimbursement if a court concludes that (1) "the public school placement violated the IDEA" *and* (2) "the private school placement was proper under the Act." *Id.* at 15. Importantly, the first factor is a threshold question: if the public school placement would have been appropriate, the court's analysis ends, and a disabled child's parents are not entitled to reimbursement. 20 U.S.C. § 1412(a)(10)(C)(i) ("[The IDEA] does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a [FAPE] available to the child and parents elected to place the child in such private school or facility."); *M.C. ex rel. Mrs. C v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000) ("Only if a court determines that a challenged IEP was inadequate should it proceed to the second question.").

## III. DISCUSSION

In reviewing an administrative determination under the IDEA, the Court must address

two questions that are aimed at DCPS's paralleling responsibilities to comply with the procedural

and substantive requirements of the IDEA:

> First, has the State complied with the procedures set forth in the Act? And second,
> is the individualized educational program developed through the Act's procedures
> reasonably calculated to enable the child to receive educational benefits? If these
> requirements are met, the State has complied with the obligations imposed by
> Congress and the courts can require no more.

*Rowley*, 458 U.S. at 206-07. Accordingly, the Court must analyze (1) whether the IEP designed

for N.S. was procedurally deficient, and (2) whether, given the contours of the IEP, N.S. was

receiving sufficient educational benefits to meet the requirements of a FAPE. However,

"procedural flaws do not automatically render an IEP legally defective." *Roland M. v. Concord

Sch. Comm.*, 910 F.2d 983, 994 (1st Cir. 1990) (en banc). Rather, "an IDEA claim is viable only

if . . . procedural violations affected the student's *substantive* rights." *Lesesne ex rel. B.F. v.

District of Columbia*, 447 F.3d 828, 834 (D.C. Cir. 2006). "Before an IEP is set aside, there must

be some rational basis to believe that procedural inadequacies compromised the pupil's right to

an appropriate education, seriously hampered the parents' opportunity to participate in the

formulation process, or caused a deprivation of education benefits." *Roland M.*, 910 F.2d at 994.

Here, Plaintiffs contend that the IEP prepared for N.S. in June 2008 was procedurally and

substantively inadequate and that the Hearing Officer improperly ignored or discounted the

evidence in the record showing that Defendants denied N.S. a FAPE. Defendants disagree,

arguing that the IEP was proper and that any defects in the IEP did not cause substantive harm to

N.S. because Plaintiffs unilaterally placed him at the Lab School before the IEP could be put into

action at Murch. Defendants concede that the Lab School was a proper placement for N.S., and

therefore the only question before the Court is whether Defendants denied N.S. a FAPE by

failing to provide an adequate IEP for the 2008-09 school year. Plaintiffs allege a number of

purported procedural and substantive deficiencies in the June 2008 IEP. The Court shall review

each of these alleged deficiencies and then address the adequacy of the IEP.

     *A.    Alleged Deficiencies in the June 2008 IEP*

        1.   <u>Failure to Include Present Levels of Performance</u>

Plaintiffs contend that the June 2008 IEP was inadequate because it did not include a

statement of N.S.'s present levels of academic achievement and performance as required by 20

U.S.C. § 1414(d)(1)(A)(i)(I). Plaintiffs argue that without a statement of present levels of

performance, it is impossible for educators and parents to assess how much progress the student

is expected to make under the IEP. *See* Pls.' Mem. at 15-16. Defendants do not dispute that the

IEP failed to include N.S.'s present levels of academic achievement and performance. *See* Pls.'

Stmt. ¶ 25; Defs.' Resp. Stmt. ¶ 25.[3] The MDT/IEP team meeting notes also reflect a minimal

---

[3] Defendants do not dispute this fact in their responses to Plaintiffs' Statement of Material
Facts. *See* Defs.' Resp. Stmt. ¶ 25. However, Defendants take a different position in their briefs,
claiming that the IEP *did* contain present levels of performance and that Plaintiffs' version of the
IEP is missing the page that discusses them. *See* Defs.' Mem. at 16 & n.2; Defs.' Reply at 4 &
n.1. This "missing page" can be found at page 335 of the Administrative Record in Defendants'
version of the IEP, and it does in fact describe some of N.S.'s present levels of performance. *See*
AR 335. Plaintiffs contend that they received "a new copy of the IEP" with this missing page on
October 14, 2008, after they inquired about its omission. *See* Pls.' Mem. at 15 n.5. Plaintiffs
also raised this issue at the hearing. *See* 12/5/2008 Tr. at 23-24. Although the Hearing Officer
did not rule on this issue explicitly, his written decision assumes that the IEP did not include
present levels of performance and goes on to consider whether the omission caused any
substantive harm to Plaintiffs. *See* AR 5. Because the Court strictly enforces LCvR 7(h), the
Court shall hold Defendants to the position they adopted in their response to Plaintiffs' Statement
of Material Facts, which was that Defendants do not dispute that DCPS failed to include present
levels of academic achievement and performance in the IEP, but that such a failure is "immaterial

discussion of N.S.'s present levels of performance.  *See* AR 212-14.  Defendants argue, however, that this omission was harmless.  The Hearing Officer concluded that Plaintiffs offered no evidence that this failure impeded the exercise of any substantive right under the IDEA.

### 2.  Failure to Identify Supplementary Aids & Services

Plaintiffs also argue that the IEP was inadequate because it did not identify any supplementary aids and services that the school system planned to provide N.S. in the classroom as required by 20 U.S.C. § 1414(d)(1)(A)(IV).  *See* AR 209.  Defendants do not dispute that the N.S. requires a multitude of supplementary aids and services in the classroom and that the IEP failed to identify any such aids and services.  *See* Pls.' Stmt. ¶¶ 29-30.  The MDT/IEP team meeting notes also do not reflect a detailed discussion of what supplementary aids and services would be provided to N.S.  *See* AR 212-14.  However, Defendants argue that the omission was harmless because Murch officials testified at the due process hearing that supplementary aids and services could be provided to N.S. if necessary.  *See* Defs.' Mem. at 16.  The Hearing Officer Decision does not specifically address this deficiency in the IEP.

### 3.  Lack of Appropriate Goals and Objectives for Written Language

Plaintiffs contend that the IEP was inadequate because it did not include goals and objectives for N.S. with respect to his written language skills, an area that Defendants allegedly knew was deficient.  The IDEA requires the IEP to include "a statement of measurable annual goals, including academic and functional goals, designed to . . . meet the child's needs that result from the child's disability to enable to the child to be involved in and make progress in the

---

in that N.S. never availed himself of this IEP and suffered no substantive harm from any minor procedural defect in the IEP."  Defs.' Resp. Stmt. ¶ 25.

general education curriculum . . . [and] meet each of the child's other education needs that result from the child's disability." 20 U.S.C. § 1414(d)(1)(A)(II). The MDT/IEP meeting notes do specifically address N.S.'s written language skills deficits. Defendants concede that the IEP failed to include specific goals and objectives to address N.S.'s significant deficits in written language. *See* Pls.' Stmt. ¶ 27. However, Defendants argue that this failure was immaterial because N.S. never returned to Murch for the 2008-09 school year, where his IEP could have been modified if necessary. *See* Defs.' Resp. Stmt. ¶ 27. At the due process hearing, Ms. Chuahy, N.S.'s special education teacher, testified that the reason for excluding written language objectives was that N.S. first needed to master letter and sound recognition before moving on to writing. *See* 2/24/09 Tr. at 107-08. The Hearing Officer Decision does not address this issue.

4.     Lack of Sufficiently Individualized Goals

Plaintiffs argue that the goals articulated in the IEP were not sufficiently individualized to meet N.S.'s needs. Plaintiffs rely for this proposition on Michelle Davis, an educational consultant who testified on Plaintiffs' behalf at the hearing. Ms. Davis testified that the June 2008 IEP's goals in reading and math—which call for N.S., as a second grader, to master first-grade reading and math standards with 80% accuracy—are too broad to provide meaningful guidance. *See* 12/5/08 Tr. at 55-56. Ms. Davis noted that these goals are the same as those found in the previous year's IEP, indicating that N.S. did not make significant progress in meeting those goals, which suggests they were not properly individualized to ensure his development. *See id.* The Hearing Officer Decision does not explicitly address this issue.

5.     Lack of Speech & Language Services

Plaintiffs claim that the IEP was inadequate because it failed to include speech and

language services, which Plaintiffs believe were necessary given N.S.'s difficulties with language. Plaintiffs rely on testimony given at the hearing by Donna Pavluk, a speech and language therapy expert, who claimed that N.S. had difficulties discriminating and manipulating sounds in ways that make it hard for him to spell and read fluently. *See* 12/5/08 Tr. at 114-15. Ms. Pavluk opined that N.S. should receive therapy for his speech and language deficits. *See id.* at 120. The Hearing Officer decision does not explicitly address this issue.

6. Occupational Therapy Services

Plaintiffs claim that the IEP is inadequate because it failed to propose occupational therapy ("OT") services to address N.S.'s motor skills deficit, despite the fact that DCPS was aware of N.S.'s need for some form of OT services. It is clear that the June 2008 IEP document itself does not propose any OT for N.S. *See* AR 333-44.[4] However, Defendants call this is a "nitpicking attack," *see* Defs.' Mem. at 16 n.1, because a Prior to Action Notice was issued on the same day as the IEP, June 12, 2008, calling for N.S. to be evaluated for occupational therapy services. *See* AR 215 (Prior to Action Notice). At the hearing, Ms. Mitchell testified that although the IEP was finished on June 12, 2008, the OT evaluation was not completed until later in the summer. *See* 2/24/09 Tr. at 155-56. The OT evaluation was conducted on July 18, 2008, and recommended that N.S. receive 45 minutes per week of school-based occupational therapy to address fine motor skills. *See* AR 229-33 (OT evaluation); 12/5/08 Tr. at 136-40 (testimony of Christine Chang, occupational therapy expert). However, the MDT/IEP team did not reconvene or revise N.S.'s IEP to include OT services after the evaluation. The Hearing Officer Decision

---

[4] On one page of the IEP, "Occupational Therapy" is written in as a service to be provided to N.S. but is crossed out. *See* AR 334.

does not address this issue.

7. Pullout Services

Plaintiffs argue that the June 2008 IEP is inadequate because it calls for all of N.S.'s specialized instruction to be provided in the general education classroom setting, which Plaintiffs believe will not be adequate to address N.S.'s needs. Plaintiffs contend that the IEP proposed an inclusion program for N.S. solely because Murch was becoming an inclusion school and that the decision to move away from the pullout model ignored N.S.'s needs for specialized instruction. Plaintiffs point out that the IEP itself acknowledged that N.S. "requires small structured environment to accommodate disabilities." *See* AR 339. The Hearing Officer rejected Plaintiffs' claim that placement at Murch in an inclusion setting was inadequate to meet N.S.'s needs. Ms. Chuahy and Ms. Mitchell both testified that the inclusion program could meet N.S.'s needs, and the Hearing Officer found their testimony more persuasive. *See* AR at 5.

B. *Adequacy of the June 2008 IEP*

Ultimately, the question before the Court is whether or not the defects in the June 2008 IEP are so significant that Defendants failed to offer N.S. a FAPE. The Hearing Officer found that although the IEP was incomplete, Plaintiffs could not prove they were substantively harmed by the inadequacies because they unilaterally placed N.S. at the Lab School before the IEP went into effect and therefore could not show that the deficiencies prevented DCPS from providing an appropriate education at Murch.[5] The Hearing Officer also concluded, based on the testimony of

---

[5] The Hearing Officer Decision only mentions one of the alleged procedural deficiencies: the failure to include present levels of performance. *See* AR at 5. The Court cannot determine from the record whether the Hearing Officer considered the other procedural defects enumerated above.

DCPS witnesses, that placement at Murch in an inclusion setting was appropriate. Defendants defend the Hearing Officer Decision, arguing that the defects in the IEP were merely procedural or technical and that they did not deprive N.S. or his parents of any substantive rights under the IDEA. Defendants, as well as the Hearing Officer, cite cases such as *Kruvant v. District of Columbia*, 99 F. App'x 232 (D.C. Cir. 2004), and *Lesesne v. District of Columbia*, 447 F.3d 828 (D.C. Cir. 2006), for the proposition that procedural flaws will not automatically render an IEP legally defective. However, the procedural errors in *Kruvant* and *Lesesne* were failures to meet statutory deadlines, errors that are far less significant than failures to include required information in an IEP about the services to be provided a disabled student.

Defendants contend that as long as Murch was "willing and able" to provide N.S. with appropriate services to meet his educational needs, any errors or deficiencies in the IEP are harmless. *See* Defs.' Mem. at 16. However, the IDEA requires that a school district do more than simply provide services adequate to meet the needs of disabled students; it requires school districts to involve parents in the creation of individualized education programs tailored to address the specific needs of each disabled student. *See A.I. ex rel. Iapalucci v. District of Columbia*, 402 F. Supp. 2d 152, 163-64 (D.D.C. 2005) ("Given the importance of the IDEA's procedural safeguards, it should be of no surprise that when a school district or other state agency violates 'the procedural requirements of the Act by failing to develop an IEP in the manner specified, the purposes of the Act are not served, and the district may have failed to provide a FAPE.'" (quoting *W.G. v. Bd. of Trustees of Target Range Sch. Dist.*, 960 F.2d 1479, 1485 (9th Cir. 1992))). The IEP must be specific enough to allow parents to understand what services will be provided and make a determination about whether the proposed placement is adequate.

Defendants concede that N.S.'s June 2008 IEP was supposed to be final, but the record shows that in many ways it was effectively incomplete. The IEP was completely missing a statement of N.S.'s present levels of performance. The IEP failed to describe any supplementary aids and services to be provided N.S., despite the fact that Defendants concede that such services were necessary. The MDT/IEP team meeting notes reflect at most a superficial discussion of these inadequacies. And the IEP failed to address N.S.'s need for occupational therapy, despite the fact that Defendants were aware of N.S.'s motor skills deficiencies. Although the MDT/IEP team did call for an OT evaluation on June 12, 2008, the results of that evaluation could not have been known at the time, and Plaintiffs could not be certain that the IEP would ultimately be amended to provide the necessary OT services. Defendants completed an OT evaluation for N.S. in July 2008 before the start of the 2008-09 school year but did not reconvene the MDT/IEP team or revise the IEP to reflect the need for OT services.

Even more troubling are the internal inconsistencies in the IEP regarding the nature of services that would be provided to N.S. On the one hand, the IEP expressly rejects pullout services, indicating that none of N.S.'s services would be provided outside the general education setting. *See* AR 333. On the other hand, the IEP also states that services cannot be provided in the general education classroom because N.S. "requires small structured environment to accommodate disabilities." *See* AR 339. This conflict on the face of the IEP is also reflected in the notes from the June 2008 MDT/IEP team meeting. On the one hand, the team acknowledged N.S.'s need for one-on-one instruction, recommending three hours of specialized instruction in reading and math and suggesting that N.S. work with a literary coach. *See* AR 213-14. On the other hand, the meeting notes show that the discussion was focused on the benefits of inclusion

with no apparent discussion about the pullout services that N.S. had been provided and whether those were a viable option for the 2008-09 school year.

In her testimony at the hearing, Principal Lewis testified that she had explained to Plaintiffs that in the inclusion setting, N.S. would get pullout specialized instruction so that he could meet his benchmarks. Ms. Chuahy, the special education teacher, testified that the IEP would have been implemented by giving N.S. two hours of specialized instruction inside the general education classroom and one hour of pullout services. Ms. Chuahy also testified about many additional specialized services that would be available to N.S. under the inclusion model outside the general education classroom, such as time with reading and math specialists. Yet all three of Defendants' witnesses acknowledged that the IEP discussed at the June 2008 meeting did not prescribe pullout services and that pullout services would have to have been added, if necessary, only *after* an initial evaluation period in the inclusion setting. In essence, then, the IEP established only an initial placement in the inclusion setting, with specialized services to be determined at a later date. The MDT/IEP team meeting notes do not indicate that N.S.'s parents were told that N.S. would be provided with specialized services, and Ms. Mitchell testified that although the possibility of adding pullout sessions for N.S. was discussed, that message was not clearly communicated at the meeting. Thus, Plaintiffs did not have an understanding from the June 2008 MDT/IEP meeting or from the written IEP document whether or not such services would actually be given to N.S.

Defendants, as well as the Hearing Officer, fault Plaintiffs for placing N.S. at the Lab School before giving him a chance to learn in the inclusion setting at Murch. But parents are not required to wait and see a proposed IEP in action before concluding that it is inadequate and

choosing to enroll their child in an appropriate private school. *See Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2492-93 (2009) (holding that parents may be reimbursed for private-school placement when a school district fails to provide a FAPE even where the student has never received instruction in the public school); *see also Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994) ("[A] school district cannot escape its obligation under the IDEA to offer formally an appropriate educational placement by arguing that a disabled child's parents expressed unwillingness to accept that placement.") Moreover, N.S.'s parents were justifiably skeptical that an inclusion program with no prescribed pullout services would be adequate to meet N.S.'s education needs when he had failed to make significant progress during the previous year at Murch with pullout services and when everyone agreed that he needed specialized instruction in a "small structured environment" for the upcoming year. Both Ms. Chuahy and Principal Lewis testified that the availability of pullout services was a critical reason why they believed that an inclusion setting would work for N.S. Ms. Mitchell also testified that Murch's shift away from a pullout-only model to the "schoolwide application model" affected the decision to place N.S. in the general education setting, which suggests that the change away from pullout services was driven by the school's needs rather than N.S.'s.

The Hearing Officer's rather abbreviated six-page decision fails to address any of these discrepancies. In finding that the inclusion program at Murch was an appropriate placement for N.S., the Hearing Officer relied almost entirely on Ms. Chuahy's testimony. *See* AR at 5-6. He noted that "[s]he testified that she believed [N.S.] could benefit from [Murch] and that [Murch] can address all of his needs" and that Plaintiffs "offered no evidence that could counter her testimony." AR at 6. Indeed, Ms. Chuahy did testify that placement at Murch in the inclusion

setting is "appropriate because [N.S.] is going to get a lot of support here."  *See* 2/24/09 Tr. at 87.

However, it is clear that Ms. Chuahy's testimony was based on her belief that N.S. would receive

at least one hour of instruction each day outside the general education classroom to address his

specific needs, with possible consultations by reading and math specialists.  Thus, the Hearing

Officer relied on evidence about what services *could have been* provided by Murch instead of

considering what services were actually called for by the IEP or adequately discussed at the IEP

meeting.  Because the purpose of the due process hearing is to contest the adequacy of the IEP

and the placement, the Hearing Officer should not consider evidence about services not

prescribed by the IEP or discussed at the IEP meeting.  *See generally A.K. ex rel. J.K. v.*

*Alexandria City Sch. Bd.*, 484 F.3d 672, 682 (4th Cir. 2007) ("In evaluating whether a school

district offered a FAPE, a court generally must limit its consideration to the terms of the IEP

itself.")

The June 2008 IEP failed to adequately describe the services that would be provided in an

inclusive education setting, and the discussion at the IEP meeting as reflected in the meeting

notes did not adequately describe those services either.  The Hearing Officer's conclusion that

Murch was an appropriate placement relies on testimony that goes beyond what was prescribed

by the IEP.  The Court finds that the June 2008 IEP gave Plaintiffs an incomplete picture of the

educational services that might have been provided at Murch to meet N.S.'s educational needs

and forced Plaintiffs to make a decision about N.S.'s placement based on inadequate and

contradictory information.  Plaintiffs cannot be penalized for refusing to rely on a hope that

appropriate services would be provided after an initial test period.  One of the purposes of the

IEP is to ensure that the services provided are formalized in a written document that can be

assessed by parents and challenged if necessary.  *See Alfono v. District of Columbia*, 422 F.

Supp. 2d 1, 6 (D.D.C. 2006) ("[A] written, complete IEP is important to serve a parent's interest

in receiving full appraisal of the educational plan for her child, allowing a parent to both monitor

her child's progress and determine if any change to the program is necessary.")  Therefore, the

Court concludes that the June 12, 2008, IEP was inadequate and that Defendants failed to offer

N.S. a FAPE.  The Hearing Officer's decision shall be reversed.[6]

Because Defendants concede that the Lab School was an appropriate placement for N.S.,

Plaintiffs are entitled to reimbursement for the 2008-09 school year.  *See Florence County*, 510

U.S. at 15.  Once a Court finds that a public school district has failed to offer a FAPE, the Court

is authorized to "grant such relief as the court determines is appropriate."  20 U.S.C.

§ 1415(i)(2)(C)(iii).  "Under this provision, equitable considerations are relevant in fashioning

relief, and the Court enjoys broad discretion in so doing."  *Florence County*, 510 U.S. at 16

(internal quotation marks and citations omitted).  The IDEA also authorizes the award of

attorneys' fees to a prevailing party.  *See* 20 U.S.C. § 1415(i)(3)(B).  The Court shall require the

parties to file briefs regarding equitable relief and attorneys' fees.

     C.     *Motion for Leave to Supplement the Record*

On March 25, 2010, Plaintiffs filed a Motion for Leave to Supplement the Record.  In the

motion, Plaintiffs ask the Court to consider the March 13, 2010, Hearing Officer's Determination

---

    [6] In so ruling, the Court does not disturb the Hearing Officer's findings regarding the credibility of the witnesses who gave testimony at the due process hearing.  The Hearing Officer's error was not that he improperly credited or discredited witness testimony but that he apparently considered testimony regarding services that were not called for by the IEP.

that DCPS had failed to provide N.S. with a FAPE for the 2009-10 school year.[7]  Plaintiffs

contend that this recent decision confirms the factual and legal insufficiencies in the HOD that is

under review in this action.  Defendants oppose the motion, arguing that the March 2010 HOD

necessarily considered facts that were not before Hearing Officer Latif Doman when he ruled in

March 2009.  In concluding above that the June 2008 IEP was inadequate and that the March

2009 HOD should be reversed, the Court does not rely on the March 2010 HOD.  Accordingly,

Plaintiffs' motion is unnecessary and shall be DENIED.

## IV.  CONCLUSION

For the reasons explained above, the Court shall GRANT Plaintiffs' Motion for Summary

Judgment, DENY Defendants' Motion for Summary Judgment, and DENY Plaintiffs' Motion for

Leave to Supplement the Record.  The Court shall order the parties to file briefs regarding the

award of equitable relief.  An appropriate Order accompanies this Memorandum Opinion.


Date:   May 4, 2010

_____
        */s/*
COLLEEN KOLLAR-KOTELLY
United States District Judge

---

[7] Plaintiffs also ask the Court to review two recent decisions by other judges in this District.